IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
KEY WEST DIVISION

CASE NO. 13-10106-CV-KING

KAREN CABANAS VOSS,

    Plaintiff,

vs.

CITY OF KEY WEST,

    Defendant.
_____/

## ORDER GRANTING SUMMARY JUDGMENT AS TO LIABILITY

THIS CAUSE comes before the Court upon Plaintiff's Motion for Partial Summary Judgment as to Liability (the "Motion") (DE 8), filed on July 17, 2013. Therein, Plaintiff claims that summary judgment is appropriate on her own behalf because the undisputed facts demonstrate that Defendant's policy of drug testing all applicants for employment was applied to her in an unconstitutional manner. The Court heard oral argument on the Motion on April 29, 2014, during which the parties agreed that discovery is complete for purposes of a liability determination. After careful consideration of the pleadings and arguments raised by the parties, the Court finds that Plaintiff's Motion must be granted.

### I. Background

The City of Key West (the "City") implemented a Drug-Free Workplace Policy (the "Policy") on June 2, 1999. *City of Key West Drug Free Workplace Policy* at 1 (June 2, 1999) [hereinafter *Policy*]. The purpose of the Policy is "to eliminate alcohol and illegal drug use in [the City's] workplace because of [the City's] responsibility for the safe, effective and efficient

delivery of public services." *Id.* To that end, the Policy provides for, *inter alia*, 1) drug testing of all applicants for employment with the City, with refusal to submit to testing resulting in rejection of any application for employment, 2) drug testing of current employees "when the City has a reasonable suspicion that an employee is using or has used drugs or alcohol in violation of City policy," and 3) random, unannounced drug testing for employees in "public safety positions," such as certified firefighters and sworn police officers, and employees in "safety-sensitive positions," such as commercial drivers. *Id.* at 2-5, 11. The instant action challenges the City's application of the Policy to Plaintiff, whose conditional offer of employment with the City was withdrawn after she refused to submit to a pre-employment drug test.

## II. Facts

The City's Job Description for the newly created position of "Solid Waste Coordinator" states, "[t]he primary focus of this highly visible marketing and planning position is to develop, implement and expand the City's recycling programs, with a secondary focus of overseeing other tasks within the City's Solid Waste Utility." *City of Key West Solid Waste Coordinator Job Description* at 1 (DE 1-4) [hereinafter *Job Description*]. Additionally, the position of Solid Waste Coordinator includes the following duties/tasks/jobs:

- Design, develop and implement promotional and educational recycling materials for dissemination to the public.
- Facilitate the City's residential, multi-family, and commercial recycling program to encourage increased participation in accordance with the City's Solid Waste Master Plan.
- Collect and analyze recycling data via spreadsheets and database management system; maintain monthly reporting.
- Establish and maintain reference system for public information with an emphasis on updating and continually improving City's website page.
- Present to civic groups, public organizations, individual businesses, and the community to increase awareness and promotion of the County's recycling programs, as well as the opportunity for businesses to cut costs through recycling participation.
- Work with special events organizers to facilitate recycling participation, and ensure their compliance with City's special events requirements for recycling.

2

- Developing and implementing environmental strategies, action plans, policies and practices that ensure waste reduction and sustainability practices;
- Perform other planning, research, and other tasks as needed for the City's Solid Waste Utility.
- Be able to relieve Transfer Station Manager on occasion when Manager is on leave.
- Participate in environmental education events/organizations, special events and research or pilot programs.
- Integrating and ensuring compliance with federal, state and local environmental legislation and reporting environmental performance.
- Performs other job-related duties as assigned.

*Job Description* at 2. The Transfer Station is a facility in which solid waste retrieved from residences and businesses around the City is deposited onto a "tipping floor" by waste management trucks and private haulers and then transferred to large hauling trucks for disposal outside of the City. Heavy equipment trucks and machines are often operating simultaneously at the Transfer Station, and it is the Transfer Station Manager's responsibility to supervise and oversee the operation of the Transfer Station. Neither the Transfer Station Manager (or any of the Transfer Station staff) nor the Solid Waste Coordinator are subject to random, unannounced drug tests pursuant to the Policy.

The new position, described above, was created in 2012. In December of 2012, Plaintiff applied to be the City's first Solid Waste Coordinator. In connection with her application for employment, Plaintiff: 1) permitted the City to make copy of her driver's license; 2) provided the City with a description of her educational history; 3) provided the City with her employment history; 4) provided the City with a list of three references; 5) answered (in the negative) whether she had ever been convicted of a criminal offense 6) was subjected to a Monroe County Sheriff's Office search of her arrest record. *See* DE 9-3. On January 28, 2012, Plaintiff was offered the Solid Waste Coordinator position. On January 31, 2012, Plaintiff was approved for the position by the City Manager and the Assistant City Managers for Administration and Operations. On February 5, 2012, she reported to Human Resources for the final stage of the application process,

3

at which Plaintiff was provided with a copy of the Policy; signed both a drug-testing identification form and an Employee Acknowledgement Agreement, acknowledging receipt of the Policy; and was asked to report to the City's drug-testing specimen collection site within one hour to give a urine specimen for urinalysis. The Employee Acknowledgement Agreement states that, "As a job applicant, I freely and voluntarily agree to a urinalysis drug screen as part of my application for employment. I understand that a refusal to test . . . will disqualify me from employment." *Employee Acknowledgement Agreement* (DE 9-8).

The Policy requires all applicants for employment to report to Key West Urgent Care to provide a specimen for urinalysis. Applicants provide the specimen from within a private bathroom; applicants are not monitored or watched while producing the specimen. The specimen is then transported to Quest Diagnostics, a laboratory licensed by the Florida Agency of Health Care Administration, for a ten-panel drug screen test.[1] The Policy provides: that the results of the test will be maintained in confidentiality by the City, that the test results may not be used in any criminal proceeding against the applicant, and for a procedure by which applicants may challenge a positive test result. *Policy* at 8-9. Applicants who either refuse to submit to the drug test or whose test returns a positive result are not hired for employment.

Plaintiff did not report to the collection site as instructed, but instead went immediately to the City Attorney's office and objected to being subjected to pre-employment drug-screening pursuant to the Policy. On February 28, 2012, Plaintiff was informed that the City offered the Solid Waste Coordinator position to another candidate because Plaintiff refused to take the pre-employment drug test.

---

[1] The urinalysis tests for the presence of: alcohol, amphetamines, cannabinoids, cocaine, opiates, phencyclidine, methaqualone, barbiturates, benzodiazephines, methadone, and propoxyphene.

### III. Legal Standard for Summary Judgment

Summary judgment is appropriate where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If the record as a whole could not lead a rational fact-finder to find for the nonmoving party, there is no genuine issue of fact for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party bears the burden of pointing to the part of the record that shows the absence of a genuine issue of material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see also Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991) (holding that the nonmoving party must "come forward with significant, probative evidence demonstrating the existence of a triable issue of fact.").

On a motion for summary judgment, the court must view the evidence and resolve all inferences in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment. *See id.* at 252. If the evidence offered by the nonmoving party is merely colorable or is not significantly probative, summary judgment is proper. *See id.* at 249–50.

### IV. Legal Framework for Analysis of Suspicion-less Drug Testing

It is well-settled that drug testing which utilizes urinalysis is a "search" that falls within

5

the ambit of the Fourth and Fourteenth Amendments. *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 617 (1989) ("[C]ollection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable."). To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 652-53 (1995); *see also Skinner*, 489 U.S. at 619 ("[A] search or seizure . . . is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause."). However, the Supreme Court has recognized particularized exceptions to the main rule in situations where the government proffers a "special need" or "important governmental interest" which is furthered by the intrusion. *Skinner*, 489 U.S. at 619, 624. Moreover, the Supreme Court has also found testing regimes substantially similar to the one at issue in this action to be "relatively noninvasive," such that, if the City makes its "special needs" showing, the City could probably not be faulted for excessive intrusion. *See Chandler v. Miller*, 520 U.S. 305, 318 (1997). Accordingly, to prevail the City must show a need or interest, "beyond the normal need for law enforcement" or "crime detection," that is "sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *See Skinner*, 489 U.S. at 619, 624; *see also Chandler*, 520 U.S. at 318.

## V. Discussion

Plaintiff moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for partial summary judgment against the City and for an order of the Court declaring that the City's Policy, which requires all applicants for employment with the City to submit to pre-employment drug-screening, was applied to her unconstitutionally. Plaintiff argues that the City has failed to make the required showing of a special need or important governmental interest which justifies its invasion of Plaintiff's Fourth Amendment privacy interest. The City opposes summary

judgment, and argues: 1) the City has demonstrated a special need which justifies suspicion-less testing of applicants for the Solid Waste Coordinator position; and, alternatively, 2) that the challenged portion of the Policy, which applies only to applicants for employment, does not provide for an unreasonable search. The Court will first discuss whether the City has shown a special need or important governmental interest justifying the Policy, and, finally, the Court will address the City's argument that suspicion-less testing of applicants is not unreasonable.

### A. The City's Special Need or Important Governmental Interest

The Supreme Court employs a burden-shifting analysis when considering the propriety of suspicion-less drug testing requirements. When it is demonstrated that a drug test has been administered without individualized suspicion of wrongdoing, the burden initially falls upon the government to show a special need or important governmental interest that justifies the Fourth Amendment intrusion. *Chandler*, 520 U.S. at 314. If that showing is made, courts "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id.* The City argues two alternative interests justify the Policy's requirement of suspicion-less drug testing for applicants for the Solid Waste Coordinator position. First, the City argues that it has an important interest in the "safe, effective, and efficient delivery of public services," second, the City argues that the Solid Waste Coordinator is a safety-sensitive position for two reasons: 1) the Solid Waste Coordinator must occasionally supervise the Transfer Station, and 2) the Solid Waste Coordinator must give presentations to school-aged children.

### 1. The City's Interest in the "Safe, Effective and Efficient Delivery of Public Services"

The first interest relied upon by the City is stated within the Policy itself. The Policy provides that its goal is "to eliminate alcohol and illegal drug use in its workplace because of [the City's] responsibility for the safe, effective and efficient delivery of public services," that "[d]rug

7

or alcohol use in the workplace may result in or contribute to on-the-job accidents, motor vehicle accidents and personal injury to City employees and the public," and that "employees who illegally use drugs tend to be less productive, less reliable and prone to greater absenteeism than their fellow employees," which in turn, "impairs the efficiency of City departments, creates a greater burden on reliable employees and undermines public confidence in all City employees." *Policy* at 1-2. While undoubtedly well-meaning, the purpose of the Policy outlines a "symbolic" interest, which the Supreme Court has previously rejected as a special need justifying suspicion-less drug testing. *See Chandler*, 520 U.S. at 321-22.

In *Chandler*, the Supreme Court rejected Georgia's assertion that a similar interest justified the state's suspicion-less drug testing of candidates for high office. *Id.* Georgia maintained that it had a special interest in testing all candidates because "the use of illegal drugs draws into question an official's judgment and integrity; jeopardizes the discharge of public functions, including antidrug law enforcement efforts; and undermines public confidence and trust in elected officials." *Id.* at 318. The Court found that Georgia's justification, and its commitment to the struggle against drug abuse, fell short of demonstrating the type of "special need" sufficient to suppress the Fourth Amendment's requirement of individualized suspicion.

Just like the proposed justification in *Chandler*, the Policy's justification is notably lacking any indication of a concrete danger. *See id.* at 318-19. Indeed, there is no evidence in the record showing a serious problem of drug abuse amongst applicants for employment with the City,[2] or even amongst City employees generally, which might serve to confirm the City's assertion of a special need for a suspicion-less drug testing regime and justify a departure from

---

[2] The only evidence suggests that, since implementation of the Policy in 1999, the City has tested 937 applicants with only twenty-one applicants, or 2.2 percent, failing their pre-employment drug tests. DE 34-8.

8

the Fourth Amendment's usual requirement of individualized suspicion. Accordingly, the City's symbolic interest in the "safe, effective and efficient delivery of public services" is insufficient to justify the intrusion on Plaintiff's rights under the Fourth Amendment.

### 2. Whether the Solid Waste Coordinator is a Safety-Sensitive Position

The City argues that suspicion-less drug testing of all applicants for the Solid Waste Coordinator position is warranted because it is a safety-sensitive position. It is undisputed that the Solid Waste Coordinator's duties include supervising the Transfer Station when the Transfer Station Manager is on leave and making environmental education presentations at schools to school-aged children. The question before this Court is whether these duties render the Solid Waste Coordinator a safety-sensitive position.

The Supreme Court has approved suspicion-less drug testing of employees in certain "safety-sensitive" positions. *See Skinner*, 489 U.S. at 620-21. In *Skinner*, the Court relied on the documented link between drug- and alcohol-impaired railroad employees and the incidence of train accidents to find that "surpassing safety interests" justified a mandatory, suspicion-less testing program for railroad employees involved in certain train accidents because railroad workers are positioned to "cause great human loss before any signs of impairment become noticeable to supervisors." *Skinner*, 489 U.S. 607-08, 628. Thus, in *Skinner*, the Court performed a context-specific inquiry and found, based on evidence, that railroad employees occupy safety-sensitive positions because the negligent operation of a locomotive presents a grave potential for harm to people and property.

The City argues that the Solid Waste Coordinator position is likewise safety-sensitive because it is undisputed that heavy equipment and trucks are often operating simultaneously on the "tipping floor" of the Transfer Station and "[w]hen the [S]olid [W]aste Coordinator fills in

for the Transfer Station Manager, the [S]olid [W]aste [C]oordinator must be physically present on the tipping floor of the transfer station requiring [sic] an elevated level of awareness to avoid causing harm to herself and others," and "the [S]olid [W]aste [C]oordinator must be present on the tipping floor to fulfill the position's duties to '[c]ollect and analyze recycling data via spreadsheet and data bases [sic] management system.'" DE 32 at 13. The City's position is not supported by the evidence.

First, the City's current Solid Waste Coordinator, William Thompson (the person to whom the City offered the position after revoking its offer to Plaintiff), testified during his deposition that the Solid Waste Coordinator can collect and analyze recycling data remotely without ever having to visit the Transfer Station, much less the tipping floor. DE 39-5 at 76. Second, the evidence does not support that the Solid Waste Coordinator must be physically present on the tipping floor while filling in for the Transfer Station Manager. Thompson also testified that the Transfer Station Manager spends the majority of his time in his office – not on the tipping floor – and that, while he has never had to in eight months as Solid Waste Coordinator, if he did have to fill in for the Transfer Station Manager, he would spend most of his time in the office "number crunching and taking care of payroll." DE 39-5 at 73. Additionally, the Utilities Manager for the City, Rhuel Jackson Gewin, testified that the Transfer Station uses spotters – Transfer Station employees who undergo a certification process – to direct the movement of heavy equipment around the facility to minimize the chances of accidents, and that the Solid Waste Coordinator is not certified as a spotter. DE 39-6 at 46-49. As the evidence demonstrates that the Solid Waste Coordinator is neither actively involved in safety-related duties around the Transfer Station, nor needs to be physically present at the Transfer Station to collect and analyze recycling data, the City's position is without merit.

10

Moreover, the instant case is distinguishable from *Skinner*. In *Skinner*, the Court found that "surpassing safety interests" justified suspicion-less testing after it was presented with evidence that on-the-job intoxication in the railroad industry caused twenty-one accidents over a ten-year period, resulting in twenty-five fatalities, sixty-one non-fatal injuries, and property damage estimated at $19 million. *Id.* at 607, 634. There is absolutely no evidence in the instant case which suggests that any accidents at the Transfer Station were a result of on-the-job drug impairment or intoxication, and the damage which occurs during accidents at the Transfer Station is nowhere near the same order of magnitude as the accidents in *Skinner*. To wit, the only evidence related to accidents that have occurred in the Transfer Station was provided by the City's Utilities Manager, who stated he was aware of occasions during his four-year tenure as Utilities Manager where the Transfer Station door was mistakenly lowered onto vehicles, and one occasion when a Transfer Station staff member "was in the wrong space and got covered with trash," but "he was okay." DE 39-6 at 11, 76.

Thus, unlike *Skinner*, there is no evidence before this Court which indicates that on-the-job intoxication is a significant problem amongst employees working at the Transfer Station (or even in the City's Utilities Department generally), or any indication that accidents and property damage in the Transfer Station are attributable to alcohol and drug use. Additionally, the City's position that the Solid Waste Coordinator is a safety-sensitive role is further undermined by the fact that the City does not subject the Solid Waste Coordinator, the Transfer Station Manager, or any of the Transfer Station staff to the same unannounced, random drug testing to which it subjects employees the Policy classifies as "public safety positions" or "safety-sensitive positions." *See Policy* at 4. Accordingly, the Court rejects that the Solid Waste Coordinator is a safety-sensitive position because of its duties at the Transfer Station.

11

The City's final argument, that the duty to make environmental education presentations to school-aged children renders the Solid Waste Coordinator a safety-sensitive position, is likewise unavailing. As a starting point, it is significant to note that the Solid Waste Coordinator has never actually made such a presentation. DE 39-5 at 35-37. Additionally, the undisputed evidence shows that the Solid Waste Coordinator has no *in loco parentis* responsibilities to the children to whom presentations are made and that the students' teachers will be in the classroom during the presentations (and perhaps another City employee). As there is no evidence suggesting that the Solid Waste Coordinator will be entrusted with the supervision, safety, or security of children; that the Solid Waste Coordinator will have unfettered, unsupervised access to, or, by virtue of continuous interaction, be in a position to exert influence over, children; or that the Solid Waste Coordinator will be in possession of "dangerous machinery and hazardous substances" during presentations to children, the Court rejects that the Solid Waste Coordinator is a safety-sensitive position because of this duty. *See Aubrey v. Sch. Bd. Of Lafayette Parish*, 148 F.3d 559, 564 (5th Cir. 1998) (finding janitor was a safety-sensitive position because he handled "dangerous machinery and hazardous substances" around children); *see also Knox Cnty. Educ. Ass'n v. Knox Cnty. Bd. Of Educ.*, 158 F.3d 361, 375, 384 (6th Cir. 1998) (holding that teachers are safety-sensitive positions because they have "unique *in loco parentis* obligations and . . . immense influence over students").

### B. Applicants versus Current Employees

The City urges the Court to draw a distinction between applicants for employment and current employees. The City relies extensively on a case from the Court of Appeals for the D.C. Circuit to suggest that the Court should find that suspicion-less drug testing of applicants for employment, as opposed to current employees, is reasonable. *See Willner v. Thornburgh*, 928

F.2d 1185 (D.C. Cir. 1991). In essence the City suggests that suspicion-less drug testing of applicants is reasonable because applicants can refrain from applying for positions which require pre-employment drug testing. In *Willner*, the D.C. Circuit determined that pre-employment drug testing of applicants to be Justice Department attorneys was reasonable because the applicants had undergone "extraordinarily intrusive" background investigations which lessened their expectations of privacy. *Id.* at 1191-92. As a starting point, the instant case is distinguishable because the Solid Waste Coordinator is subjected only to routine reference and arrest history checks, whereas in *Willner* the applicants consented to an extensive background investigation by the Federal Bureau of Investigation. *See id.* However, even if *Skinner* was not distinguishable, there is no precedent in this circuit which holds that the government can violate a person's rights under the Fourth Amendment so long as prior notice of the impending violation is given. Accordingly, the Court finds no reason to adopt the distinction between applicants and employees that the City has suggested.

## VI. Conclusion

The City has failed to carry its burden of demonstrating a special need or important governmental interest which justifies the Fourth Amendment intrusion complained of in this action. While suspicion-less drug testing of applicants for employment may have become routine for private employers, this Court is bound by controlling precedent to find that the Policy is unconstitutional as applied to Plaintiff.

Accordingly, it is **ORDERED, ADJUDGED,** and **DECREED** that:

1. Plaintiff's Motion for Partial Summary Judgment as to Liability **(DE 8)** be, and the same is, hereby **GRANTED.** Summary judgment on liability is

entered in Plaintiff Karen Cabanas Voss' favor on her claim for prospective relief against Defendant City of Key West.

2. Defendant's Motion for Summary Judgment **(DE 32)** be, and the same is, hereby **DENIED.**

3. This action remains pending with respect to the issue of prospective relief against Defendant City of Key West

**DONE AND ORDERED** in Chambers, at Miami, Miami-Dade County, Florida, this 9th day of May, 2014.

JAMES LAWRENCE KING  
UNITED STATES DISTRICT JUDGE

**Cc:** All counsel of record.